**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROBERT GLEN JONES, Jr.,
　　　　*Petitioner-Appellant,*

　　　　v.

CHARLES RYAN,
　　　　*Respondent-Appellee.*

No. 10-99006

D.C. No.
4:03-CV-00478-
DCB

OPINION

Appeal from the United States District Court
for the District of Arizona
David C. Bury, District Judge, Presiding

Argued and Submitted
June 14, 2012—San Francisco, California

Filed August 16, 2012

Before: Ronald M. Gould, Richard C. Tallman, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould

9373

## COUNSEL

Daniel D. Maynard (argued) and Jennifer Reiter, Maynard Cronin Erickson Curran & Sparks, PLC, Phoenix, Arizona, for petitioner-appellant Robert Jones.

Lacey Stover Gard (argued) and Jeffrey A. Zick, Arizona Attorney General's Office, Tucson, Arizona, for respondent-appellee Charles Ryan.

## OPINION

GOULD, Circuit Judge:

Petitioner-Appellant Robert Jones ("Jones") appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. Jones was convicted of six murders in Arizona state court and was sentenced to death in 1998. He

was also convicted of first-degree attempted murder, aggravated assault, armed robbery, and first-degree burglary. The district court granted a certificate of appealability ("COA") on Jones's prosecutorial misconduct claim. We expand the COA to include the ineffective assistance of counsel allegations related to Jones's prosecutorial misconduct claim. We have jurisdiction under 28 U.S.C. § 2253, and we affirm the district court's denial of Jones's habeas corpus petition.

## I[1]

In 1996, six people were killed during two armed robberies in Tucson, Arizona. On May 30, the Moon Smoke Shop was robbed, where two victims were killed and a third was wounded by gunfire. On June 13, the Fire Fighters Union Hall was robbed, and four persons there were killed.

The Moon Smoke Shop robbery began when two robbers followed a customer, Chip O'Dell, into the store and at once shot him in the back of the head. Four employees were in the store: Noel Engles, Steve Vetter, and Mark Naiman were behind one counter concentrating on the stock, and Tom Hardman was behind another. After hearing the gunshot, Engles and Naiman looked up to see a robber in a long-sleeved shirt, dark sunglasses, and a dark cowboy hat wave a gun at them and yell to get down. Naiman recognized the gun as a 9mm. Engles dropped to his knees and pushed an alarm button.

Engles noticed a second robber move toward the back room and heard someone shout, "Get the f*** out of there!" The

---

[1]We draw our factual statement from the findings of fact made in the state court proceedings. For the Arizona Supreme Court's more detailed description of events, *see State v. Jones*, 197 Ariz. 290, 297 -98 (2000). Jones may not rebut the factual findings made in his state court proceedings absent clear and convincing evidence. *Gonzalez v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This he has not done and we accept the factual findings of the state court proceedings.

gunman at the counter told Naiman to open the cash register. After Naiman did so, the gunman reached over the counter and began firing at the others on the floor. Thinking that the others were dead, Naiman ran out of the store and called 911 at a pay phone. On the floor behind the counter, Engles heard shots from the back room and then, realizing the gunmen had left the store, also ran out of the store, by the back door. Running up the alley to get help, Engles saw a light-colored pickup truck with two people in it accelerate and turn on a street into heavy traffic.

Naiman and Engles survived. Vetter also survived, although shot in the arm and face. O'Dell and Hardman were both killed by close range shots to the head, O'Dell at the entrance to the store and Hardman in the back room. Three 9mm shell casings were found in the store, one beside O'Dell and two near the cash register. Two .380 shells were found near Hardman's body. Two weeks after the robbery, Naiman met with a police sketch artist who used his description of the gunmen to create sketches of the suspects. These sketches were released to the media in an effort to catch the perpetrators. At trial, two acquaintances of Jones testified that when they saw the police sketches their first thought was that they looked like Jones.

The Fire Fighters Union Hall was robbed two weeks later. There were no survivors of the violence that befell those present there. Nathan Alicata discovered the robbery at 9:20 p.m. when he arrived at the Union Hall and discovered the bodies of Maribeth Munn (Alicata's girlfriend), Carol Lynn Noel (the bartender), and a couple, Judy and Arthur Bell. The police investigation turned up three 9mm shell casings, two live 9mm shells, and two .380 shell casings. About $1300 had been taken from the open cash register, but the robbers were unable to open the safe. The coroner, who examined the bodies at the scene, concluded that the bartender had been shot twice, and that the other three victims were shot through the head at close range as their heads lay on the bar. The bar-

tender's body had a laceration on her mouth consistent with having been kicked in the face, and Arthur Bell's body had a contusion on the right side of his head showing he was struck with a blunt object, possibly a pistol.

In 1998, petitioner Robert Jones was convicted of these ghastly crimes of multiple murder and sentenced to death. His co-defendant, Scott Nordstrom, had been convicted in a separate proceeding six months earlier. *See State v. Nordstrom*, 200 Ariz. 229 (2001). Jones's theory of the case at trial and on appeal was that Scott Nordstrom and his brother David Nordstrom committed these murders, while he was not involved. While there was no physical evidence or positive eyewitness identifications conclusively linking Jones to the crimes, both he and his truck matched descriptions given by survivors of the Moon Smoke Shop robbery. The prosecution's case against Jones was based in large part on David Nordstrom's testimony. David Nordstrom gave a detailed account of his role as a getaway driver in the Moon Smoke Shop robbery, and identified Jones as a robber and shooter, as well as the guns he carried. But that was not all of the testimony against Jones. Lana Irwin, an acquaintance of Jones, also testified that she overheard Jones talking about details of these murders that the police had not released to the general public. Jones's friend David Evans gave additional implicating testimony.

## A.  David Nordstrom's Testimony

At Jones's trial, David Nordstrom gave extensive testimony about the events surrounding the two robberies. In January 1996, David Nordstrom was released from prison after a conviction for theft, and began living at his father's home in Tucson, Arizona. At the time of the offenses in this case, David Nordstrom was under "home arrest" (requiring him to be home by a certain time every evening) and monitored by an ankle monitor. David Nordstrom re-established his friendship with Jones and began working construction jobs. Before April

1996, David Nordstrom obtained a .380 semiautomatic pistol from a friend, Cindy Inman, which he gave to Jones after Jones requested it for protection. Cindy Inman testified at trial that David Nordstrom took this pistol without her permission and that when she asked for it back several months later, he told her he had dropped it in the bottom of a lake.

On May 30, 1996, Scott Nordstrom and Jones picked up David Nordstrom in Jones's truck, an old white Ford pickup. Jones was wearing his usual attire: a long-sleeved western shirt, Levi's, boots, sunglasses, and a black cowboy hat. In a parking lot near the Tucson Medical Center, Jones broke into a VW station wagon that he aimed to steal. He could not start it, but he found a 9mm pistol. The owner of the VW testified that his car had been broken into and his gun stolen on May 30. Jones kept the 9mm and gave Scott Nordstrom the .380 pistol he had obtained from David Nordstrom.

As the three continued driving, they discussed the possibility of a robbery, and Jones suggested that they rob the Moon Smoke Shop. He parked behind the store, telling David Nordstrom that Jones and Scott Nordstrom would go in, rob the store, and be right out. David Nordstrom, while waiting in the pickup truck, then heard gunfire from inside. According to David Nordstrom's testimony, after returning to the truck, Jones said, "I shot two people," and Scott Nordstrom said, "I shot one." David Nordstrom also testified that Jones and Scott Nordstrom were mad at him for unnecessarily driving the truck past the front of the shop during the getaway. Jones, Scott Nordstrom, and David Nordstrom split the money from the Moon Smoke Shop robbery.

On the day of the Union Hall murders, Scott Nordstrom gave David Nordstrom a ride home. David Nordstrom's parole officer produced records at trial verifying that David Nordstrom's ankle-monitoring unit indicated that he had not left his father's home on the night of the murders. Late that evening, according to David Nordstrom, Jones entered David

Nordstrom's father's house and told David Nordstrom that he and Scott Nordstrom had robbed the Union Hall. David Nordstrom's stepmother Terri Nordstrom also testified that she remembered Jones showing up at her house late at night looking for David Nordstrom at some point in June 1996, which was unusual.

Again per the testimonial story told by David Nordstrom, Jones told David Nordstrom that because the bartender could not open the safe, Scott Nordstrom kicked her and shot her. Jones said that he then shot the three other witnesses in the back of the head. Jones, Scott Nordstrom, and David Nordstrom later disposed of the guns by throwing them into a pond south of Tucson, and Scott Nordstrom and David Nordstrom burned Arthur Bell's wallet at another location. David Nordstrom kept the secrets of the murders until he saw an appeal on television for information. He testified that his conscience was getting to him, so he told his girlfriend, Toni Hurley, what he knew. Hurley later made an anonymous 88-CRIME call, which led to David Nordstrom's contact with the police, and the ultimate release of the information.

## B.  Lana Irwin's Testimony

David Nordstrom's testimony was key to the prosecution, but he was not the only important witness for the prosecution. Jones was also linked to the crime by Lana Irwin, who testified that she overheard him discuss details of the murders at her home in Phoenix with a mutual acquaintance on several occasions in the summer of 1996. Irwin also testified that she colored Jones's hair from red to brown because "he was hiding from someone." Irwin testified that she overheard the following bits of information from Jones:

- Jones said that he had two partners, brothers, that one was inside and one was in the truck, and that he was mad at the one in the truck.

- Jones said that he had killed four or five people in Tucson by shooting them in the head, and that his partner had killed two.

- One of the people Jones shot was a man by a door (which the prosecutor equated with Chip O'Dell).

- "They ran to the back room. [Jones's] partner chased them and they were shot." The prosecutor argued that this described the murder of Tom Hardman.

- "One door was open and one had to be kicked in," which the prosecutor argued described the kicked in door in the back of the Moon Smoke Shop next to which Tom Hardman was killed. The prosecutor further argued that this door was kicked in by the intruders to get at Tom Hardman. The door was actually kicked in by police when they were securing the scene. This inconsistency forms the basis of Jones's Claim 1-A.

- Some women were killed at a "bar or maybe a restaurant," "a red room, everything was red." This description matches the Union Hall.

- There were three women who "weren't supposed to be there so they had to be shut up so they didn't run their necks." Irwin's daughter also testified that she had overheard Jones saying that "the bitches weren't supposed to be there," and that she overheard Jones talk about a smoke shop.

- Jones shot an older man sitting in a chair with his head back in the same red room, who the prosecutor argued was Arthur Bell. Jones claims these

statements are inconsistent with other evidence of
the position of Arthur Bell's Body in Claim 1-B.

- Jones "pistol whipped" the older man in the head
  with a gun. He said it "sounded like a baseball
  swing."

- Jones said that he didn't get enough money. The
  prosecutor argued this was because Jones and
  Scott Nordstrom couldn't break into the safe at
  the Union Hall.

Irwin testified that she first described these details to police
as a dream about a red room because she didn't want to tell
the police what she knew out of fear for her safety. On cross-
examination, Jones's counsel attacked her credibility by
bringing out several details of this "dream" that did not match
what had happened at the robbery. However, the prosecutor
argued that Irwin could only have learned the facts that corre-
sponded to the robberies from Jones because Irwin had never
been to Tucson and many of the corresponding facts had not
been released to the general public.

## C.   David Evans' Testimony

In addition to David Nordstrom and Irwin's testimony, the
prosecution also presented the incriminating testimony of
David Evans. David Evans, a friend of Jones, testified that he
was present on several occasions when Jones had conversa-
tions about the sketches of the Moon Smoke Shop robbery
suspects that had been published in the newspaper. In the first
conversation, Jones's roommate Chris Lee asked Jones if he
was part of the killings, and Jones responded "[i]f I told you,
I'd have to kill you." Although this possibly overworked wit-
ticism might be viewed as a joke, a jury could also rationally
view it as an admission by Jones. In the second conversation,
Evans was giving Jones a hard time about his similarity to the
sketches, and Jones said that "if he told [Evans], he would

have to kill [him]," and that "you don't leave witnesses." A jury could also view this as an admission of a deadly *modus operandi*. Evans also testified that Jones went to Phoenix twice in 1996, and that on the second occasion he said that he couldn't stay in Tucson because "he thought some people would be looking for him because he had killed somebody." If believed by the jury, these statements could easily be viewed as an admission of culpability.

## D. Subsequent Procedural History

Jones's conviction was automatically appealed directly to the Arizona Supreme Court, which affirmed the conviction on June 15, 2000. *Jones*, 197 Ariz. 290. The United States Supreme Court denied certiorari on April 16, 2001. *Jones v. Arizona*, 532 U.S. 978 (2001). Jones then returned to Arizona Superior Court to file his Petition for Post-Conviction Relief ("PCR") on February 15, 2002. In his PCR petition, Jones alleged the various instances of prosecutorial misconduct that make up Claim 1 of his habeas corpus petition for the first time. Jones also alleged that his appellate counsel was ineffective for not raising these issues on direct appeal.

The Arizona PCR court denied relief on September 18, 2002, holding that Jones's allegations of prosecutorial misconduct were precluded under Arizona Rule of Criminal Procedure 32.2(a)(3). In the alternative, it also considered and denied each claim on its merits. It dismissed Jones's ineffective assistance of appellate counsel claims, holding that because the precluded prosecutorial misconduct claims "were also dismissed based on substantive grounds, [Jones] cannot establish that he suffered prejudice because of the ineffective performance of his appellate counsel." The Arizona Supreme Court summarily denied review on September 9, 2003, after which Jones filed his habeas corpus petition in the district court on September 18, 2003. The district court denied the habeas corpus petition. Jones now presents us with his appeal of the district court's decision.

## II

A prisoner appealing the district court's final order in a habeas corpus proceeding must first obtain a certificate of appealability ("COA") by making "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). This language codifies the standard set forth in *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983): "a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.' " *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Thus not every issue raised in a habeas corpus petition earns an automatic right to appeal, an appeal may lie only for issues that are worthy of fair debate by reasonable judges. The district court granted a COA on one issue:

> Whether Petitioner has established cause and prejudice to overcome the procedural default of Claim 1, which alleges various instances of prosecutorial misconduct.

Jones asks us to expand the COA to include thirteen allegations of ineffective assistance of counsel and nine additional claims, all of which were rejected by the district court. After carefully considering these claims, on which we required the government to submit responsive briefing, we conclude that most issues raised do not surmount the barrier to review posed by the COA requirements of AEDPA. We hold that the only additional issue that reasonable jurists could debate concern Jones's allegations of ineffective assistance of trial counsel related to trial counsel's failure to discover and use the inconsistencies in the testimony regarding the kicked-in door in Jones's trial, the testimony at Scott Nordstrom's trial, and several police reports. We expand the COA to include the following issue:

Whether Petitioner's trial counsel rendered constitutionally deficient performance by failing to discover and utilize the inconsistencies in the testimony concerning the kicked-in door at Petitioner's trial, the testimony at Scott Nordstrom's trial, and various police reports.

We deny Jones's request to further expand the COA.

## III

We review the district court's denial of a petition for writ of habeas corpus *de novo*. *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court cannot grant habeas relief based on a claim that was adjudicated on the merits in state court proceedings unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Jones's federal habeas petition was filed after 1996 and must be reviewed under the strict standards of AEDPA. We review the last reasoned state decision regarding the claims, here the Arizona PCR court's 2002 decision. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

A claim in a federal habeas petition may be procedurally defaulted if it was actually raised in state court but found to be defaulted on an adequate and independent state procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). Arizona Rule of Criminal Procedure 32.2(a)(3) is independent of federal law and has been regularly and consistently applied, so it is adequate to bar federal review of a claim. *Oritz v. Stewart*, 149 F.3d 923, 931 -32 (9th Cir. 1998). But we will consider the merits of the claim if the petitioner can demonstrate either (1) "cause for the default and actual prejudice as

a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

The district court held that Jones's prosecutorial misconduct claim was procedurally defaulted because the PCR court had invoked Arizona Rule of Criminal Procedure 32.2(a)(3) to find it procedurally barred. To address whether ineffective assistance of appellate counsel was sufficient cause to excuse the procedural default, the district court addressed the merits of each of Jones's prosecutorial misconduct allegations, applying AEDPA deference to the PCR court's merits determination.[2] The district court determined that the allegations lacked merit, and therefore "appellate counsel was not ineffective for failing to raise them on appeal" and "appellate [counsel's] ineffectiveness does not constitute cause to excuse [Jones's] default."

We examine the merits of Claim 1 in the next Section, and like the district court decide that it is without merit. It should be obvious that the failure of an attorney to raise a meritless claim is not prejudicial, *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985), so the PCR court's rejection of Jones's ineffective assistance of appellate counsel claim is not an unreasonable application of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We hold that the alleged ineffectiveness of

---

[2]We have not yet determined whether federal courts should give AEDPA deference to the state court determination on an ineffective assistance of counsel claim when deciding whether that claim constitutes cause for procedural default. *Compare, e.g.*, *Fischetti v. Johnson*, 384 F.3d 140, 154 -55 (3d Cir. 2004) (holding that "AEDPA does not establish a statutory high hurdle for the issue of cause" to overcome procedural default), *with Powell v. Kelly*, 531 F. Supp. 2d 695, 724 (E.D. Va. 2008) (holding that an ineffective assistance claim alleged as cause is subject to AEDPA principles). We need not and do not decide that issue here. For even if no AEDPA deference applies to the assessment of cause and prejudice, we would hold that the PCR court's merits determinations are correct even under *de novo* review.

Jones's appellate counsel for not presenting these claims to the Arizona Supreme Court does not constitute cause to excuse Jones's procedural default of these claims. *See Sexton v. Cozner*, 679 F.3d 1150, 1161 (9th Cir. 2012). Jones's alternative contentions that the procedural default doctrine does not apply to these claims are all without merit.

**IV**

Jones alleges that his due process and fair trial rights under the Fifth and Fourteenth Amendments were violated by repeated misconduct by Prosecutor David White. He first challenges two crime-scene details that Lana Irwin testified she overheard from Jones, but which Jones claims were caused by the police after the perpetrators left. First, Jones points to White's argument that the intruders had kicked in the office door in the back room of the Moon Smoke Shop, while police reports establish that this door was kicked in by police after the intruders left (Claim 1-A). Second, Jones claims that Arthur Bell was found slumped over the bar at the Union Hall, but that "his head was moved back over his chair" at some point after the police arrived but before photos were taken (Claim 1-B). From these alleged inconsistencies, Jones asks us to infer that the police or prosecution showed Irwin pictures of the crime scene before trial to bolster her testimony. He contends that White suborned perjury and unlawfully manipulated evidence to make Irwin's testimony seem consistent with the facts.

Jones also alleges that Prosecutor White improperly tried to deflect suspicion from David Nordstrom by eliciting misleading testimony that implied only one of the two police sketches looked like a Nordstrom brother (Claim 1-C) and making a false avowal to give a foundation for the test of David Nordstrom's electronic monitoring system to support an alibi for the Union Hall murders (Claim 1-D). His final allegation is that the prosecution suppressed exculpatory evidence (Claim 1-E).

**[1]** Review for prosecutorial misconduct claims on a writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). For Jones to gain habeas relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (quoting *Donnelly*, 416 U.S. at 642). A prosecutor's knowing use of false testimony to get a conviction violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prevail on a due process claim based on the presentation of false evidence, a petitioner must show "that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (quoting *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003)). False testimony is material such that the conviction must be set aside if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). The question is not "whether the defendant would more likely than not have received a different verdict" if the false testimony had not been presented, but whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

**[2]** An allegation that the prosecution failed to disclose material evidence is governed by *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Under *Brady*, "[t]he government violates its constitutional duty to disclose material exculpatory evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is 'material')." *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005).

## A. The Kicked-in Door

There were two doors side by side in the back room of the Moon Smoke Shop leading to two smaller rooms, a bathroom and an office. Police reports from the officers first on the scene show that the office door was kicked in by police when they were securing the premises. Detective Salgado testified that "the rest room door was damaged" in grand jury proceedings. Pictures of the bathroom door taken at the crime scene show a mark on the outside panel about two feet off the floor.

Jones argues that Detectives Brenda Woolridge and Joseph Godoy perjured themselves by testifying that the office door was kicked in by the robbers, and that Prosecutor White knowingly used this false testimony to strengthen the testimony of Lana Irwin. At Scott Nordstrom's trial, which White also prosecuted, Godoy had testified that the police had kicked in the office door. Yet at Jones's trial eight months later, when White elicited testimony from him to lay the foundation for the photograph of the damaged office door, Godoy failed to mention that the police kicked in this door:

> Q  Let me show you two other photographs. Did you find any damage to one of the doors in the back area?
>
> A  Yes.
>
> Q  Showing you what has been marked State's 15 and 16, do those represent a door that you saw that was damaged?
>
> A  Yes.

The next day, Lana Irwin testified about various things she had overheard Jones say, including a statement about a kicked in door:

Q  Do you remember — you started to say something about a door. Do you remember hearing any conversation about doors?

A  *One door was open and one door had to be kicked in.*

Q  I'm sorry. One had to be kicked in?

A  Yes. One was kicked in, one was open.

On the final day of trial, Detective Woolridge testified about her interview with Lana Irwin and the kicked-in door:

Q  Were you present at the first trial?

A  Yes, I was.

Q  Did you sit there every day of the testimony?

A  Yes, I did.

Q  Just like you have been here?

A  Yes.

Q  Did Lana Irwin tell you something about a door being kicked in?

A  Yes, she did.

Q  Was there a door kicked in, in one of these cases?

A  Yes, in the back room at the Moon Smoke Shop.

Q  As shown in State's 50.

A  Yes, it is.

Q  The fact that a door was kicked in, was that ever mentioned at the first trial in this case?

A  No, it was not.

Q  Lana Irwin, did you ever see her in the audience at the first trial?

A  No.

The bathroom door was not discussed at Jones's trial.

Prosecutor White argued that the intruders kicked in a door during both his opening statement and closing argument. During his opening statement he said:

> And there's doors here. This is the bathroom and there is a closet. One of these doors has been kicked in. Apparently the shooter kicked in the door, ordered Tom Hardman to come out and lie on the ground and executed him, two shots.

During his closing argument he emphasized that Lana Irwin could "describe in graphic detail the crime that [Jones and Scott] commit[ed]," discussing the many similarities between Irwin's testimony and the crime, including the kicked-in door:

> She overhears the defendant saying one door had to be kicked in. Remember that? And we have a door kicked in. We have a photograph, one of these doors, this one right here, 58, was kicked in.
>
> Now, ladies and gentlemen, that particular fact wasn't even brought out at the trial of the other guy, Scott Nordstrom. That didn't come out at the trial, and yet Lana Irwin tells you she overhears this

defendant telling Coats the one door had to be kicked in. And sure enough.

Prosecutor White's statements, supported by Detectives Godoy's and Woolridge's testimony, were false for two reasons: (1) the office door shown in the pictures was kicked in by police, not by the intruders, and (2) the kicked-in door was testified about by Detective Godoy in Scott Nordstrom's trial. The State argues that this was "an innocent mistake," that the police and prosecutor mixed up the bathroom and office doors when preparing for trial, and the evidence shows that "Scott Nordstrom 'kicked or pounded on' the bathroom door," which was damaged as a result. The PCR court accepted the State's explanation. We hold it was not unreasonable to do so.

The PCR court was "troubled by the contradiction" between the testimony at the two trials, but held that the testimony concerning the kicked-in door was not material given the overall context of the evidence presented at trial. The PCR court stressed that "the kicked-in door was but one of the many correlations between Jones's statements overheard by Irwin and the facts of the crime," such that Jones would likely have been convicted "even if Irwin had not testified about the kicked-in door."

**[3]** We agree that the testimony about the kicked-in door was not material. The kicked-in door was only relevant because it was thought to be one of the details of the crime that Lana Irwin had learned from Jones. But this was only a small part of the mosaic of trial testimony presented by Lana Irwin. That this detail is inconsistent would not have done much to undermine Irwin's credibility, given that she was only testifying that she heard Jones say one door had to be kicked in. There are many ways this information could have been distorted: Scott Nordstrom (who pursued and killed Hardman) could have exaggerated or misstated his account of what happened in the back room when discussing the crime with Jones; Jones could have assumed a door had been kicked

in based on noises he heard when Scott Nordstrom went into the back room; or Jones could have exaggerated what had happened when talking about it with his friend in Lana Irwin's apartment; or Lana Irwin, who based her testimony on what she overheard Jones tell a friend, might have misheard or misunderstood that detail.

[4] We are not persuaded that the prosecution and police would so jeopardize both their case and their reputations by intentionally putting on false testimony regarding such a minor detail. After all, Lana Irwin was able to accurately testify about many other details she overheard from Jones that match details of the crime and David Nordstrom's account. For example, she testified: that Jones had two partners, brothers, one was inside and one in the truck, and Jones was mad at the one in the truck; that Jones killed four or five people in Tucson by shooting them in the head, and his partner killed two; that one man was shot standing by a door, and that another was chased by Jones's partner to a back room and shot; that women were killed at a bar or restaurant where everything was red; that an older man was pistol whipped and shot in the head while sitting in a chair with his head leaning back in that same red room; and that Jones didn't get enough money. We hold that the PCR court was not unreasonable in accepting the State's explanation for this discrepancy, and further hold that the incorrect testimony and argument regarding the kicked-in door was not material.[3]

---

[3]Jones contends the above misconduct was "compounded" by the prosecution's failure to disclose the police reports which illustrated that the detectives' statements were false. The reports are among 2209 pages of disclosure stamped "FIRST DISCLOSURE July 28, 1997." The PCR court determined that this was "part of an orderly and seemingly reliable, long-standing institutional process" that "creates a rebuttable presumption that the documents were disclosed," and found that the affidavits from Jones's trial attorneys that they do not remember seeing the report were insufficient to rebut that presumption. We hold that the PCR court's determination was reasonable.

## B. Arthur Bell's Body

Another corroborating detail that Prosecutor White emphasized between Irwin's testimony and the facts of the crimes was that Arthur Bell had been shot in the head and left in a chair with his head leaning back. Jones contends that Bell's body was initially lying with his head down on the bar and was moved sometime after police arrived, but before pictures were taken. If this were true, then Irwin's ability to accurately describe the body's position could show that the prosecution or police showed her pictures from the crime scene.

Jones bases his argument on three police reports: the first two describe Bell as "slouched over another bar stool," and "slumped over sitting at the bar," and the third recounts the statement of the witness who discovered the victims at the Union Hall robbery, Nathan Alicata, that "he saw Arthur sitting on a bar stool slumped over the bar." In a subsequent interview with detectives, Alicata described Bell as "slumped on the chair on the bar sort of sideways." Jones claims this is inconsistent with the reports of other officers who arrived on scene later, which described Bell as "in a chair at the bar. His head was leaning back," and "in a bar stool up by the front of the bar. He was leaning back in the stool with his head leaning back also."

**[5]** The PCR court found that there was sufficient evidence to "support a reasonable conclusion that, when the intruders departed [the Union Hall], Arthur Bell's body was slouched in a chair at the bar with his head leaning back." This determination was not unreasonable. None of the police reports mention Bell's body being moved, and the pictures introduced at trial, which show Bell slumped sideways across a barstool with his head leaning back, are not inconsistent with the descriptions pointed to by Jones.[4]

---

[4]We also reject Jones's allegation that detectives lied when they said that information about the Union Hall being red had not been released to the media. The fact that a newspaper ran a color photo of the celebration in the Union Hall after Scott Nordstrom's conviction in 1997 does not mean that police released information.

## C. Misconstrual of Police Sketches (Claim 1-C)

A police artist made two composite sketches of the perpetrators of the Moon Smoke Shop robbery, one with a hat and one without a hat, based on the recollections of witness Mark Naiman. Mike Kapp, an associate of the Nordstrom brothers, told Detective Edward Salgado in a "free talk" interview (and later testified at Scott Nordstrom's trial) that these sketches resembled the Nordstrom brothers (specifically, the hatless sketch was David Nordstrom and the one with a hat was Scott Nordstrom).

[6] Jones contends that Detective Salgado and Prosecutor White misled the jury at Jones's trial by suggesting that the hatless sketch resembled both Nordstrom brothers while "the suspect with a hat was always clearly identified as Jones." After Salgado agreed on cross-examination that "other people had come forward identifying other people other than Jones from those composites," White asked Salgado on redirect how he would describe one of the sketches:

> A   Slim, slim face, narrow face, long face.
>
> Q   Do either one of the Nordstroms have a long face?
>
> A   They both have long faces.
>
> Q   Is that the similarity that people were telling you about?
>
> A   Yes.

The PCR court found that this was "a reasonable line of questioning given Jones's connection with the Nordstroms and the fact that the police identified the brothers as initial suspects in the investigation." The district court held that this testimony was not material because the "overwhelming evidence of guilt

unrelated to the sketches renders any alleged 'false impression' inconsequential." We agree, and hold that White's questioning of Salgado did not deny Jones a fair trial or undermine confidence in the verdict. *See Hayes*, 399 F.3d at 984.

## D.   False Avowal About David Nordstrom's Stepmother's Phone (Claim 1-D)

As a condition of his parole, David Nordstrom had an electronic monitoring device attached to his ankle paired with a unit hooked up to the phone at his parents' house. If David Nordstrom left the house when he wasn't supposed to do so, the electronic monitoring system would record the curfew violation. To demonstrate that the system could not be circumvented, Prosecutor White introduced evidence of a test performed at the Nordstroms' home eighteen months after the murders. To establish foundation to allow the test results to be admitted, White avowed that Terri Nordstrom (David Nordstrom and Scott Nordstrom's stepmother) would later testify that the phone used in the test was the same one as the one in use at the time of the murders. But Terri Nordstrom was not asked about this at Jones's trial, and at Scott Nordstrom's trial she had testified that the phone used for the test was not the same as the phone that was in use the night of the Union Hall robbery.

Jones argues that "White made this false avowal in order to force this key document into evidence without foundation." The PCR court denied this claim because it found that the expert testimony of Jones's parole supervisor "settled any question concerning the relevancy of the computer printout showing the results of the experiment." This determination was not unreasonable, given the expert testimony at trial "that the kind of phone used had no impact on the functioning of the monitoring system other than to cause an occasional busy signal."

**[7]** "[T]he touchstone of due process in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Prosecutor White's erroneous avowal was not wholly insubstantial, but it did not impact the fairness of Jones's trial. Because the evidence would have been admissible without the avowal, we hold that the allegedly false avowal was not material.

### E.    Delayed Disclosure of Jones's Hat and Boots (Claim 1-E)

The police obtained Jones's hat and boots on March 18, 1998. They were submitted to the Tucson Police Department's Crime Lab and tested negative for the presence of blood. The state disclosed that it had Jones's hat and boots on April 23. Trial was originally supposed to begin on May 4, but was continued until June 16 due to numerous last minute disclosures by the prosecution, including this one. The hat and boots were admitted into evidence at trial and the negative blood test results stipulated to the jury.

Jones argues that Prosecutor White and Detectives Salgado and Woolridge deliberately hid this exculpatory evidence on April 20, three days before the hat and boots were disclosed, by giving Jones's attorneys "highly evasive and incomplete" answers as to whether the police had Jones's hat and boots during a pre-trial conference.[5] Jones contends that the fact that the information was turned over to defense counsel before

---

[5]When the existence of the hat and boots were disclosed on April 23, the defense moved to preclude the evidence due to its late disclosure. In his response to the motion to preclude, Prosecutor White explained that the State gave these answers because it "could not 'link' the hat and boots to the Defendant" on April 20. But White "reasoned that while the State could not prove the boots belonged to Defendant, the Defendant might be able to prove that link," and disclosed the hat and boots because the negative blood test results may be exculpatory. The judge neither granted nor denied the motion to preclude, and instead granted a motion to continue trial for six weeks so defense counsel could investigate the new disclosures.

trial "does not excuse the blatant lying by the police and pros-
ecutor to defense counsel." The PCR court rejected this claim,
finding that the "disclosure of the hat, boots, and lab results
was not accomplished in as timely a manner as [Jones] would
have preferred," but that there was "adequate time for
[Jones's] counsel to prepare for trial."

**[8]** The district court examined this claim under *Brady*,
rejecting it because there was no suppression: "despite the
evasiveness of the detectives . . . the evidence was disclosed
to the defense nearly two months prior to trial." We agree
with both the PCR and district courts that this delayed disclo-
sure did not affect the fairness of the trial. A three day delay
in disclosure, even if unwarranted and not the product of lack
of knowledge or confusion, is not tantamount to a non-
disclosure where Jones's lawyers had the information two
months before trial and only days after it was first requested.

## V

Jones alleges that his right to counsel under the Sixth and
Fourteenth Amendments were violated because his counsel
rendered ineffective assistance by not discovering and using
the conflicted testimony on the kicked-in door at issue in
Claim 1-A, discussed in Part IV.A, *supra*. Jones argues that
his counsel should have reviewed Detectives Woolridge and
Godoy's testimony at Scott Nordstrom's trial, and that if they
had done so they would have been able to cross-examine and
impeach the detectives with their prior inconsistent state-
ments. Jones asserts that this would have changed the verdict
by undermining the credibility of the detectives and of Lana
Irwin.

To demonstrate ineffective assistance of counsel, a peti-
tioner must show that (1) his counsel's performance was defi-
cient and (2) such deficient performance prejudiced his
defense. *Strickland*, 466 U.S. at 687. *Strickland*'s second
prong requires the petitioner to "show that there is a reason-

able probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The court may "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice" without addressing whether counsel's performance was deficient. *Id.* at 699.

**[9]** The PCR court dismissed this issue for the same reasons it dismissed Claim 1-A: the testimony regarding the kicked-in door was "but one of the dozen or so correlations with the facts of the crime that were adduced from the testimony of Lana Irwin." We agree. As discussed above, challenging this fact would not have undermined Irwin's testimony regarding the many other facts that did match up, especially because Irwin was testifying as to what Jones said Scott Nordstrom did, some of it out of sight of Jones, with plenty of opportunity for exaggeration, misinterpretation, or mistake on Jones's part, or for mishearing by Irwin. We hold that Jones was not prejudiced by his counsel's failure to discover and utilize the inconsistencies regarding the kicked-in door.

## VI

On the prosecutorial misconduct issues initially certified for appeal, our task is to determine whether Jones's due process rights were violated, and "the aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Smith*, 455 U.S. at 219 (quoting *Brady*, 373 U.S. at 87). On all contentions of prosecutorial misconduct, we agree with the state courts that there was no fundamental unfairness to Jones and no due process violation. On the related ineffective assistance of counsel claims on which we expanded the scope of the certificate of appealability, we conclude that the prejudice prong of *Strickland* is not satisfied. We hold that Jones received a fair trial leading to his jury conviction of multiple murders beyond a reasonable doubt and it was not objectively unreasonable for the Arizona courts to deny habeas relief.

**AFFIRMED.**