**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN LOUIS VISCIOTTI, *Petitioner-Appellant*, | No. 11-99008 |
| | D.C. No. 2:97-cv-04591-R |
| v. | |
| MICHAEL MARTEL, *Respondent-Appellee.* | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted November 12, 2013
Pasadena, California

Filed October 17, 2016
Amended July 6, 2017

Before: Harry Pregerson, A. Wallace Tashima,
and Marsha S. Berzon, Circuit Judges.

Order;
Opinion by Judge Berzon;
Concurrence by Judge Berzon

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of habeas relief in a case in which California state prisoner John Visciotti raised (1) a penalty-phase ineffective assistance claim, focused on the allegation that key aggravating evidence was introduced only as a result of counsel's errors during the penalty proceedings; (2) a new claim that the cumulative effect of counsel's ineffectiveness during both the guilt and penalty phases of trial ultimately prejudiced the penalty proceedings; and (3) a claim that the trial judge's closure of the death-qualification voir dire proceedings violated Visciotti's Sixth Amendment right to a public trial.

The panel held that, whether or not the ineffective assistance of counsel claims have merit, they are foreclosed by the Supreme Court's prior decision in this case, *Woodford v. Visciotti*, 537 U.S. 19 (2002) (per curiam).

Regarding the trial judge's closure of death-qualification voir dire, to which counsel did not object, the panel held that de novo review continues to apply, post-AEDPA, to a contention that ineffective assistance of trial counsel constitutes cause to excuse a procedural default. The panel concluded that counsel's failure to object to the closure of death-qualification voir dire did not constitute deficient performance, and that Visciotti therefore cannot demonstrate cause to excuse his default of the public trial right claim.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Berzon, joined by Judge Pregerson, wrote separately to emphasize that this case illustrates that Supreme Court summary reversals cannot, and do not, reflect the same complete understanding of a case as decisions after plenary review.

## COUNSEL

Mark R. Drozdowski (argued), Deputy Federal Public Defender; K. Elizabeth Dahlstrom, Research & Writing Specialist; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; Statia Peakheart, Los Angeles, California; for Petitioner-Appellant.

Meagan J. Beale (argued), Deputy Attorney General; Holly Wilkens, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

## ORDER

The opinion filed October 17, 2016 is amended as follows:

1. At page 48, footnote 15 of the opinion, delete "Because we conclude that counsel's performance was not deficient, we do not consider the prejudice prong of the *Strickland* analysis." Add the following text in its place:

The Supreme Court has recently held that a petitioner claiming that trial counsel was ineffective for failing to object to the closure of voir dire bears the burden of demonstrating prejudice. *Weaver v. Massachusetts*, No. 16-240, slip op. at 11–14 (U.S. June 22, 2017). Because of our holding that counsel's performance was not ineffective, we need not determine whether Visciotti could demonstrate prejudice. We note, however, that it is extremely dubious that he could.

With the aforementioned change, the panel has unanimously voted to deny appellant's petition for rehearing. Judge Berzon has voted to deny the petition for rehearing en banc. Judges Pregerson and Tashima recommend denial of the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing is denied and the petition for rehearing en banc is rejected. No new petition for panel rehearing or petition for rehearing en banc will be entertained.

**OPINION**

BERZON, Circuit Judge:

In 1983, an Orange County jury convicted John Visciotti of first-degree murder, attempted murder, and robbery. The same jury then sentenced Visciotti to death.

On direct, automatic appeal, the California Supreme Court affirmed the judgment in its entirety. *People v. Visciotti*, 2 Cal. 4th 1 (1992) ("*Visciotti I*"). Visciotti filed a state petition for writ of habeas corpus, alleging ineffective assistance of his counsel (IAC) during the guilt and penalty phases of his trial in violation of the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668 (1984). The California Supreme Court assumed that counsel afforded Visciotti "inadequate representation in some respects" during the penalty phase, but determined that Visciotti was not prejudiced and so denied his petition. *In re Visciotti*, 14 Cal. 4th 325, 330 (1996) ("*Visciotti II*").

Visciotti next brought a federal habeas petition, alleging, among many other claims, ineffective assistance of counsel during the guilt and penalty phases of his trial. The district court granted Visciotti's habeas petition as to the penalty phase and denied it as to his conviction. We affirmed. *See Visciotti v. Woodford*, 288 F.3d 1097 (9th Cir. 2002) ("*Visciotti III*"). The United States Supreme Court summarily reversed our decision, holding that we "exceed[ed] the limits imposed on federal habeas review by" the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254). *Woodford v. Visciotti*, 537 U.S. 19, 20 (2002) (per curiam) ("*Visciotti IV*").

Following remand and further proceedings, the district court denied Visciotti's remaining claims. Visciotti appeals that denial. He asserts two species of claims. First, he contends that his counsel's ineffective assistance during the guilt and penalty phases of trial requires habeas relief as to his death sentence. Acknowledging that the Supreme Court expressly denied relief on his ineffective assistance of counsel claim, he argues that the Court did not decide the particular claims he now appeals. Second, he claims that the trial judge's closure of the death qualification voir dire proceedings violated his Sixth Amendment right to a public trial.

## I.  BACKGROUND

*Visciotti I* extensively details the facts of this case. 2 Cal. 4th at 28–33. We thus recite only a brief summary of the events here, as described by the Supreme Court in *Visciotti IV*.

> [Visciotti] and a co-worker, Brian Hefner, devised a plan to rob two fellow employees, Timothy Dykstra and Michael Wolbert, on November 8, 1982, their payday. They invited the pair to join them at a party. As the four were driving to that supposed destination in Wolbert's car, [Visciotti] asked Wolbert to stop in a remote area so that he could relieve himself. When all four men had left the car, [Visciotti] pulled a gun, demanded the victims' wallets (which turned out to be almost empty), and got Wolbert to tell him where in the car the cash was hidden. After Hefner had retrieved the cash, [Visciotti]

walked over to the seated Dykstra and killed him with a shot in the chest from a distance of three or four feet. [Visciotti] then raised the gun in both hands and shot Wolbert three times, in the torso and left shoulder, and finally, from a distance of about two feet, in the left eye. [Visciotti] and Hefner fled the scene in Wolbert's car. Wolbert miraculously survived to testify against them.

*Visciotti IV*, 537 U.S. at 20.[1]

## A. Trial

Visciotti's parents retained Roger Agajanian for representation in the pretrial proceedings, at the trial, and on appeal. Agajanian was admitted to the bar in July 1973, had never before the Visciotti case tried a capital case that went to a jury, and had never conducted a penalty phase trial. *See Visciotti II*, 14 Cal. 4th at 336.

At the outset of Visciotti's 1983 trial, the court mentioned that it would conduct "sequestered voir dire." The court explained to the pool of prospective jurors that, because the state could seek the death penalty, "we must . . . inquire of each prospective juror individually to determine in private with just the court, the two attorneys, possibly the defendant and the court personnel present, your attitudes and . . . attempt to determine if there exists any prejudice or bias that

---

[1] Hefner, Visciotti's co-defendant, was tried separately, convicted of the same offenses, and sentenced to life in prison without the possibility of parole. 2 Cal. 4th at 20 n.2. The State did not seek Hefner's execution. *Id.*

may affect your attitude toward the imposition of the capital punishment." On July 5, 6, 7, 11, 12, 13, and 14, the court conducted the death qualification voir dire. The clerk's transcript for each day reveals that the examinations were conducted "in chambers," in the presence of only the court, counsel, court reporters, and, some of the time, Visciotti.[2] Agajanian never objected to this practice on the record. Nor did the judge make findings on the record justifying the private voir dire sessions.

The prosecution's case was "based in major part on the testimony of Michael Wolbert, and on [Visciotti's] confessions." *Visciotti I*, 2 Cal. 4th at 28. Of particular relevance to this appeal, the parties agreed at the start of trial that the prosecution would not in its guilt phase case-in-chief present evidence of Visciotti's previous conviction for assaulting William Scofield with a deadly weapon. Visciotti had pleaded guilty to that offense in 1978 and served time in state prison. The prosecution abided by this agreement.

Agajanian nevertheless had Visciotti testify about his criminal history, including his 1978 conviction:

> In his guilt phase testimony, [Visciotti] claimed that the 1978 incident occurred when two men who had a problem with his roommate, Doug Favello, kicked in the door of the apartment he shared with Favello, ran in, and cut Favello's throat. A third person

---

[2] The clerk's transcript indicates that Visciotti "personally and through counsel waived his appearance for the remainder of the individual voir dire conferences" on the afternoon of July 12. He was absent as well for voir dire conducted in chambers on July 13 and 14.

with a gun remained at the door. [Visciotti] testified that he picked up the knife dropped by the person who had stabbed Favello, ran after the fleeing intruders, and stabbed the one who had slashed Favello's throat just as that person (Scofield) was trying to enter his own room. On cross examination [Visciotti] conceded that he and several friends went to Scofield's room later that night, denied that they had kicked in the door to that room or that anyone had been in bed in the room, and denied seeing, let alone stabbing, a woman who had been in the room.

*Visciotti I*, 2 Cal. 4th at 30 n.5.

On rebuttal, the prosecution called Robert D. McKay, a Crime Scene Investigator for the Anaheim Police Department, to contradict Visciotti's testimony concerning the 1978 incident. McKay had investigated the scene of the 1978 incident, including Scofield's room. He testified with respect to the door to the apartment that it "appeared it had been forced open," as the door molding and latching had been partially destroyed and there was a hole in the adjoining wall from "where the doorknob would have struck the wall." He authenticated several photographs he had taken of the crime scene, including images of two knives, blood-stained bedding, and the damaged door to the apartment.

That same night, at a hospital, McKay observed and photographed two injured parties: Scofield and Kathy Cusack. He authenticated at trial a photograph he had taken of several of Cusack's stab wounds while she lay half naked on a table in the hospital emergency room. McKay testified

that Cusack suffered from seven wounds, including "a deep laceration to the lower right breast area, a deep long cut to the inside of the right thigh, a cut to the right side, and four cuts to the back of the right arm." McKay later returned to the police department, where he observed Favello. He testified that Favello "did not have blood on his clothing or on his body," nor any evidence of an injury to his neck.

On July 29, 1983, the jury found Visciotti guilty of first degree murder of Dykstra, attempted murder of Wolbert, and robbery. *Visciotti I*, 2 Cal. 4th at 27–28. The jury "also found that the murder was committed under the special circumstance of murder in the commission of robbery, and that [Visciotti] had personally used a firearm in the commission of the offenses." *Id.* at 28 (internal citation omitted).

## B. Penalty Phase

Visciotti's penalty trial began several days later. As the California Supreme Court recounted, "[t]he only evidence presented by the [prosecution] in the initial phase of the penalty trial was the testimony of William Scofield, the victim of the June 15, 1978, assault with a deadly weapon offense to which [Visciotti] had pleaded guilty and for which he had served a prison term." *Visciotti I*, 2 Cal. 4th at 33.

Scofield testified as follows: At the time of the incident, he lived with Kathy Cusack in the same complex as Doug Favello. The dispute between him and Favello had arisen out of Favello's "loss" of Cusack's cat. At Cusack's request, Scofield spoke with Favello about the loss of the cat. Their conversation degenerated into a fist fight. Later that evening, Scofield went to Favello's room armed with a knife and

continued the argument. He did not strike Favello with the knife he brandished.

The following night, "five or six guys kicked the door [to Scofield's room] down," dragged him out of the room, and assaulted him with some combination of baseball bats, sticks, knives, and an ice pick. Scofield testified that Visciotti, part of this group, stabbed him in his back. During the altercation, Cusack remained in the room. When Scofield returned to the room, he saw her "covered with blood." Scofield's back required surgery.

The prosecution next called Cusack to testify. Agajanian objected on the ground that Visciotti had pleaded guilty only to stabbing Scofield and was not charged in the criminal information with assaulting Cusack. The court initially overruled the objection.

Just after Cusack was sworn in but before the prosecution began to examine her, the court again called counsel to the bench. The court asked the prosecutor whether the Notice of Evidence of Aggravation informed Visciotti that the prosecution would rely on Cusack's testimony during the penalty phase. The prosecutor replied that Cusack's testimony related to facts "that are an integral part of the transaction concerning [Visciotti's] prior felony conviction," which was included in the Notice.[3] As the initial 1978

---

[3] The Notice stated that "the prosecution intends to introduce, in addition to the circumstances of the charged offenses and the circumstances surrounding the alleged special circumstances the following evidence in aggravation of the penalty and wherever else admissible: . . . . Proof of Defendant's prior conviction for violation of Penal Code Section 245(a), a felony, on or about August 11, 1978, in the Superior Court of the State of California, in and for the County of Orange."

criminal complaint had expressly referred to an assault on Cusack, the prosecutor argued, even "a preliminary, absolutely minimal threshold type of investigation on the part of the defense which I'm sure a competent attorney like Mr. Agajanian . . . would do . . . would alert them to the fact there was more than one victim alleged."

The court noted that the Notice "refers strictly to a conviction for which the defendant stands accused . . . that is, the assault with a deadly weapon upon William Scofield. . . . [It] talks about what appears to be a single violation . . . and it talks about a conviction." In the end, the court precluded Cusack from testifying at all. The prosecution offered no further evidence in its aggravation case-in-chief.

Agajanian's "theory was to invoke jury sympathy for [Visciotti's] family." In particular, Agajanian presented evidence from various family members and friends that Visciotti "had never been violent toward anyone in [his] family," and that "he was violent only when under the influence of drugs." *Visciotti I*, 2 Cal. 4th at 34.

Midway through Visciotti's mitigation presentation, the prosecution moved for permission to introduce Cusack as a rebuttal witness at the close of Visciotti's case. The court granted the motion, holding "that the evidence introduced by the defense is opinion evidence by every defense witness offered [during the penalty phase] . . . that the defendant is in fact a non-violent person. The people are entitled as a matter of law to rebut that by competent evidence. Specific acts of violence and rebuttal are relevant and are appropriate to rebut an opinion that the defendant is in fact a non-violent person, so the court shall allow the witness to testify as requested."

Agajanian, in turn, moved for a continuance "to find out all of this information that this lady is apparently going to be testifying to . . . ."  After the court denied this motion, Agajanian moved for production of "certain reports . . . to help us prepare for this witness and determine the truthfulness of the statements."  The court granted the second motion.

The California Supreme Court summarized Cusack's testimony as follows:

> She first met [Visciotti] on June 12, 1978, at a party in [Visciotti's] apartment.  She had not seen him again until the early morning hours of June 15 when he and several other men broke into the apartment she shared with Scofield.  [Visciotti] had a knife.  When the other men, who were beating Scofield with bats and sticks, dragged Scofield out of the room, [Visciotti] remained in the room where Cusack was standing on the bed.  He stabbed her through the right forearm, which she had raised to protect herself, stabbed her farther up that arm, and when she fell down onto the bed, slashed her leg.  He then stabbed her in the ankle.  When [Visciotti] attempted to stab Cusack in the abdomen she told him she was pregnant.  He nonetheless tried again to stab her in the abdomen, but she rolled over and he stabbed her in the side.  He then stabbed her in the chest, slashed her shoulder, stabbed her in the area of her breast.  After stabbing Cusack eight or more times, [Visciotti] began to carve up the walls of the apartment, and to cut up the posters and pictures.  When Cusack

> hit him over the head with a stick, [Visciotti]
> ran out of the apartment.  She . . . had to be
> hospitalized for treatment of her wounds.

*Visciotti I*, 2 Cal. 4th at 33–34 (footnote omitted).  Cusack added that she was four months pregnant at the time of the attack.  *Id.* at 33 n.7.  Cusack was the last witness to testify in the penalty phase of Visciotti's trial.

During his closing argument, the prosecutor emphasized Visciotti's attack on Cusack as the primary example of Visciotti's history of violence.  While the prosecutor noted that Visciotti's conviction for assaulting Scofield qualified as an aggravating prior conviction, he emphasized Cusack's perspective on the incident.

For his part, Agajanian delivered a closing argument that the California Supreme Court, on direct appeal, described as "a rambling discourse, not tied to particular evidence." *Visciotti I*, 2 Cal. 4th at 82 n.45.  Agajanian "did not argue that any statutory mitigating factor was present."  Rather than arguing against the aggravating factors or for any mitigating factors, Agajanian's "approach was to note the tragedy and the impact of the murder victim's death on other people, and to ask the jury not to add to the tragedy or cause others to suffer the same impact by condemning [Visciotti] to death." *Id.* at 66 n.35.  And, as Justice Brown noted in her California Supreme Court habeas dissent "Agajanian systematically conceded nine of the eleven aggravating and mitigating factors set forth in Penal Code section 190.3 . . . to the prosecution."  *Visciotti II*, 14 Cal. 4th at 365 (Brown, J., dissenting).  To the extent Agajanian asserted any theory, it was to "ask[] the jury to spare [Visciotti's] life because he

was the only bad child of a loving family who would suffer if petitioner were to be executed." *Id.* at 331.

The jury began deliberating on the afternoon of August 3. After nearly two days of deliberations, the jury condemned Visciotti to death.

## C. Direct Appeal and State Post-Conviction Proceedings

Visciotti automatically appealed to the California Supreme Court. Agajanian continued to represent him for about seven years following his conviction. During that time, Agajanian filed but a single, thirty-page brief on Visciotti's behalf. Also during that period, Agajanian was convicted in an unrelated matter, in the District of Vermont, of two counts of criminal contempt. His representation of Visciotti ended in 1990, when the State Bar suspended his license to practice law.[4]

---

[4] Additional discipline followed. As the California Supreme Court explained:

> The bases for the disciplinary proceedings that followed the proceeding related to the contempt conviction were complaints that Agajanian had abandoned clients, failed to respond to client communications, made false representations and misrepresentations, lost files, and failed to perform promised services. Evidence was admitted at the evidentiary hearing that during the time he represented [Visciotti], Agajanian did not respond to client communications, failed to make court appearances, did not visit clients in jail or show up in court or other places as promised, and was distracted by

Replacement counsel filed a supplemental brief following Agajanian's suspension. That brief asserted that the closure of penalty phase voir dire violated the Sixth Amendment right to a public trial, citing *Press-Enter. Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501 (1984), and *Waller v. Georgia*, 467 U.S. 39 (1984).

The California Supreme Court affirmed the judgment on direct appeal. *See Visciotti I*, 2 Cal. 4th 1. Justice Mosk dissented, writing that he would have *sua sponte* decided that Agajanian's "pervasive and serious" deficiencies as trial counsel "resulted in a breakdown of the adversarial process at trial" to such an extent that Visciotti's conviction should not stand. *Id.* at 84 (Mosk, J., dissenting).

Visciotti next filed a habeas petition in the California Supreme Court. That court appointed a referee to take evidence and make factual findings on certain discrete questions, most of which concerned Agajanian's failure to investigate, discover, and use mitigating evidence in Visciotti's penalty phase hearing.

At the hearing, Agajanian testified that he "did not conduct formal interviews with any members of [Visciotti's] family in preparation for the penalty phase," and that he "did no investigation and did not have a social worker or investigator do any investigation to seek potentially mitigating evidence." *Visciotti II*, 14 Cal. 4th at 337. He further testified that, although he decided "to elicit sympathy

---

a civil suit against a nonlawyer who shared his office
and was accused of fraudulent sales of trust deeds.

*Visciotti II*, 14 Cal. 4th at 350 n.6.

for [Visciotti's] family as his penalty phase strategy," *id.* at 336, "he had no information about [Visciotti's] family when he made his decision on penalty phase tactics," *id.* at 337. Visciotti also offered evidence that Agajanian failed to provide mental health experts appointed by the trial court with the necessary information to provide a competent and informed evaluation. *See id.* at 337–40.

Particularly relevant here is Visciotti's evidence that "Agajanian did not review the prosecutor's file." *Id.* at 340. As *Visciotti II* described,

> [a]lthough it was the practice of the district attorney at the time of the Visciotti trial to make the case files of prosecutors available to defense counsel, Agajanian was not aware that during petitioner's 1978 assault with a deadly weapon on William Scofield, petitioner had also repeatedly stabbed Kathy Cusack who was pregnant. Agajanian did not send for the police report or go through the prosecutor's file to read it in advance of trial and thus was surprised and unprepared to face that evidence.

*Id.* Finally, Visciotti presented at the habeas hearing considerable evidence concerning facts relevant to mitigation that Agajanian failed to discover and present during the penalty phase proceedings. The California Supreme Court summarized that evidence at length in its habeas decision. *See id.* at 341–45.

After considering the referee's report, a divided court denied relief for want of prejudice. Assuming that

Agajanian's performance was constitutionally inadequate, and "[n]otwithstanding Agajanian's multiple failings,"[5] the majority reasoned, it was not reasonably probable that the jury would have recommended a lesser sentence had Visciotti received competent representation. *Id.* at 352–57. The dissent concluded otherwise, maintaining that "Agajanian's abysmal across-the-board performance rendered the penalty phase of the trial a complete and utter farce." *Id.* at 366 (Brown, J., dissenting).

## D. Federal Habeas Proceedings

In 1998, Visciotti filed the habeas petition at issue here. The district court granted relief on the basis of Agajanian's ineffectiveness during the penalty phase of Visciotti's trial but expressly rejected most of Visciotti's remaining challenges to his conviction, including his guilt phase IAC claim. Additionally, because of its ruling on the penalty phase IAC claim, the court held moot several of Visciotti's remaining claims, including his objection to the closure of the death qualification portion of voir dire. We affirmed the

---

[5] The majority assumed Agajanian "failed to afford constitutionally adequate representation because he allegedly: (1) failed to investigate and discover mitigating evidence as a result of his ignorance of the types of evidence a jury might consider mitigating; (2) failed to present readily available evidence that would have revealed to the jury the extent to which petitioner was subjected to psychological and physical abuse as a child, the impact the dysfunctional and peripatetic family life had on petitioner's development, and the correlation between these events and petitioner's resort to drugs; (3) failed to prepare, which left him unaware of the scope of the aggravating evidence to be introduced; and (4) delivered an [unfocused] closing argument, during which he undercut his client's own case by telling the jury that the evidence of petitioner's mental and emotional problems was not mitigating, prejudiced petitioner at the penalty phase of the trial." *Id.* at 353.

district court's judgment in its entirety. *See Visciotti III*, 288 F.3d at 1101.

The U.S. Supreme Court summarily reversed in a *per curiam* opinion, without merits briefing. The Court reasoned that the California Supreme Court's denial of Visciotti's state habeas petition for want of prejudice was neither contrary to, nor an unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d)(1). *Visciotti IV*, 537 U.S. at 22–27. As relevant here, *Visciotti IV* rejected our conclusion that the California Supreme Court failed to take into account available mitigating evidence, noting that "[a]ll of the mitigating evidence" that we "referred to as having been left out of account or consideration [was] in fact described" in *Visciotti II*. *Id.* at 25. Furthermore, *Visciotti IV* held that the California Supreme Court's conclusion that the "aggravating factors [were] so severe that . . . [Visciotti] suffered no prejudice from trial counsel's (assumed) inadequacy" was not unreasonable. *Id.* at 26–27. "Habeas relief," the Court concluded, "is therefore not permissible under § 2254(d)." *Id.* at 27.

On remand to this court, Visciotti asked us to consider whether the California Supreme Court's denial of his state habeas petition rested on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). We remanded to the district court "to review and rule on the argument[] in the first instance." *Visciotti v. Brown*, 406 F.3d 1131, 1131 (9th Cir. 2005).

The district court denied Visciotti's remaining claims for relief. It issued a certificate of appealability on claim 1.C (contesting trial counsel's penalty phase effectiveness) and claim 12 (contesting closure of the death qualification voir

dire). This appeal followed. After oral argument, we granted Visciotti's request to expand the certificate of appealability to cover claim 58 of his proposed second amended petition, limited to the question whether "the cumulative effect of constitutionally ineffective representation throughout the criminal process, including both the guilt and penalty phases, prejudice[d] Visciotti in the penalty phase of his trial?"

## II.  STANDARD OF REVIEW

We review a district court's denial of a petition for writ of habeas corpus de novo. *Deck v. Jenkins*, 768 F.3d 1015, 1021 (9th Cir. 2014). As Visciotti's petition is governed by AEDPA, Visciotti can prevail on a claim "that was adjudicated on the merits in State court" only if he can show that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under AEDPA, "[w]e review the last reasoned state court opinion." *Musladin v. Lamarque*, 555 F.3d 830, 834–35 (9th Cir. 2009) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). However, "when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo." *Pirtle v.*

*Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *see also Cone v. Bell*, 556 U.S. 449, 472 (2009).

## III.  DISCUSSION

### A.  Ineffectiveness of Counsel (IAC)

Ordinarily, "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* To establish *Strickland* prejudice, Visciotti must show that but for Agajanian's deficient performance, "there is a reasonable probability that [the jury] would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003). Further, "[t]o assess that probability, we consider 'the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding' — and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

Visciotti presents two IAC claims in this appeal. First, he raises a penalty phase IAC claim, focused on the allegation that key aggravating evidence, Cusack's testimony, was introduced only as a result of Agajanian's errors during the penalty proceedings. Second, as a new IAC claim, Visciotti contends that the cumulative effect of Agajanian's ineffectiveness during both the guilt and penalty phases of trial ultimately prejudiced the penalty proceedings. We conclude that, whether or not these claims have merit, they

are foreclosed by the Supreme Court's decision in *Visciotti IV*, so we may not grant habeas relief.

### 1.  Claim 1C — penalty phase IAC

The California Supreme Court denied Visciotti's penalty phase IAC claim, concluding that, assuming that Agajanian's performance was constitutionally deficient, "it is not probable that the jury would have found" the mitigation evidence Agajanian failed to present was "mitigating or sufficiently so that the evidence would have affected the jury determination that the aggravating factors outweighed the mitigating in this case." *Visciotti II*, 14 Cal. 4th at 356.  The Supreme Court held the California Supreme Court's prejudice determination reasonable under 28 U.S.C. § 2254(d)(1), as the decision was not contrary to or an unreasonable application of clearly established Supreme Court law. *See Visciotti IV*, 537 U.S. at 27.

Visciotti now argues that the California Supreme Court's decision deserves no deference for a different reason — because it "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).  The thrust of Visciotti's refashioned penalty phase argument is as follows: The California Supreme Court specifically assumed that Agajanian performed deficiently by "fail[ing] to prepare, which left him unaware of the scope of the aggravating evidence to be introduced." *Visciotti II*, 14 Cal. 4th at 353. Indeed, the state high court found that, prior to the penalty phase of trial, Agajanian "was not aware that during [Visciotti's] 1978 assault with a deadly weapon on William Scofield, [he] had also repeatedly stabbed Kathy Cusack"; "did not send for the police report or go through the prosecutor's file to read it in advance of trial"; and "did not

know evidence of the Cusack stabbing was to be presented." *Id.* at 340, 346. The California Supreme Court's ensuing prejudice determination, Visciotti contends, relied on that court's preceding determination that Visciotti "has not shown that Agajanian's failure to prepare to meet or counter the evidence about his assault on Kathy Cusack was prejudicial. He does not suggest that this evidence could have been rebutted." *Id.* at 355.

Visciotti's central § 2254(d)(2) contention is that in its prejudice analysis, the California Supreme Court unreasonably assumed that Cusack's testimony was *admissible* without regard to Agajanian's IAC, yet the trial court had initially excluded her testimony. Cusack's testimony was eventually admitted only as rebuttal to Agajanian's deficient mitigation presentation. The trial court's initial decision entirely to exclude Cusack's testimony from the penalty phase, Visciotti maintains, would have remained in force had Agajanian not "opened the door" by incompetently eliciting evidence as to Visciotti's character for nonviolence.

Visciotti called attention to these circumstances in his state habeas petition, arguing that Agajanian performed deficiently by choosing a mitigation case that opened the door to Cusack's previously precluded penalty phase testimony.**[6]**

---

**[6]** That the California Supreme Court weighed the Cusack testimony as part of its *Strickland* prejudice analysis without acknowledging that it came into evidence only as a result of Agajanian's deficient performance (which the Court otherwise assumed) is the crux of Visciotti's § 2254(d)(2) argument. That is, his challenge is not "based on the claim that the finding is unsupported by sufficient evidence," but that "the process employed by the state court [was] defective." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). As in *Taylor*, Visciotti claims that the

The assault on Cusack was one of the three components of the State's death-penalty argument at the penalty phase, along with Visciotti's prior conviction for assaulting Scofield and the heinousness of the crimes for which Visciotti was being tried. The prosecution dramatically emphasized the attack on Cusack during its penalty phase case. Most notably, in closing argument the prosecutor referred to Cusack as the "prime example" of Visciotti's history for violence, noting that Scofield fell in a "different category." The prosecutor continued:

> Going in and taking a woman alone in her bedroom after you've kicked in the door in the middle of the night for no apparent reason. She couldn't offer any motivation why he would have done this and none was presented to you. There is no reason. It's a totally senseless, vicious, brutal attack on this woman who again is isolated by herself, totally defenseless in her bedroom that night.
>
> The statements about her saying I'm pregnant, don't stab me, don't hurt the baby, then [Visciotti] immediately thereafter stabbing her right in the stomach. It's almost too cold and brutal to comment on. . . .

---

court "fail[ed] to consider and weigh relevant evidence that was properly presented" to the state habeas court, *id.* at 1001 — here, that Cusack's testimony would not have been admitted absent Agajanian's deficient performance. *See also id.* at 1008 ("[F]ailure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding.").

> [Visciotti] reenters the room where she's all by herself; she doesn't know what's going on; she's totally defenseless. And [Visciotti] stabs her seven or eight times for no apparent reason.
>
> The only conversation is she tells him, "My god. I'm pregnant. Don't hurt the baby."
>
> That's what really happened. That's the basis for his prior felony conviction. That's why he went to state prison. Now, to possibly think that's not aggravating, it's hard to believe.

Moreover, the California Supreme Court in its prejudice analysis lingered over the image of a "pregnant Kathy Cusack as she lay in bed trying to protect her fetus." *Visciotti II*, 14 Cal. 4th at 355.

Cusack's testimony would not have been admitted had Visciotti been properly represented, Visciotti argues. And, he goes on, had Cusack's testimony been precluded, that omission would have significantly affected the California Supreme Court's determination on state habeas as to whether Agajanian's deficiencies prejudiced Visciotti. In reviewing Agajanian's asserted ineffectiveness, the California Supreme Court recognized that the state courts were obliged, in assessing the prejudice worked by Agajanian's penalty phase IAC, to consider the mitigating evidence which Agajanian failed to present. *Id*. at 333–34. Consequently, in Visciotti's view, a proper reweighing of mitigating and aggravating evidence, excluding Cusack's testimony as the product of

Agajanian's incompetence and including the mitigating evidence proffered on habeas for the same reason, would have resulted in an entirely different prejudice determination, one which could have entitled him to a different penalty phase result.

Visciotti's § 2254(d)(2) arguments are not without substance. Were we writing on a blank slate, we would likely find them meritorious. But we are not writing on a blank slate.

"According to the law of the case doctrine, on remand a lower court is bound to follow the appellate court's decision as to issues decided explicitly or by necessary implication." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1129 (9th Cir. 2006) (internal citation and quotation marks omitted). "When a case has been once decided by [the Supreme Court] on appeal, and remanded to the circuit court, whatever was before [the Court], and disposed of by its decree, is considered as finally settled. The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate." *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895).

In deciding Visciotti's prior appeal, the U.S. Supreme Court broadly concluded that "[h]abeas relief is . . . not permissible under § 2254(d)." *Visciotti IV*, 537 U.S. at 27.[7]

---

[7] We note that the district court declined to address whether the U.S. Supreme Court's decision precluded review of Visciotti's IAC claim. Instead, it denied the claim on the merits. Explaining that, if the Cusack evidence had been the primary basis for the jury's sentencing decision, it "might be persuaded that Agajanian's decision to present a case in mitigation was both wrong and prejudicial," the district court found that "there was much more to the jury's penalty decision than the

Yet the Court's actual analysis was narrow; it focused exclusively on the applicability of § 2254(d)(1), reversing our prior conclusion that the California Supreme Court's previous adjudication of Visciotti's claim was both contrary to, and an unreasonable application of, clearly established federal law. *See* 537 U.S. at 27.

Moreover, and critically, the Cusack-centered IAC issues were not presented to the United States Supreme Court at all, not for lack of diligence but because of the procedural posture in which the case was decided by the Court. *Visciotti IV* was issued summarily, on the basis of the petition for certiorari alone. There were no merits briefs, and there was no oral argument. The State's petition for certiorari focused on the reasoning of our prior decision, without independently addressing the merits of any of Visciotti's contentions not directly implicated by that decision. The petition asked the Court to clarify the meaning of § 2254(d)(1). Neither the petition nor Visciotti's brief in opposition mentioned § 2254(d)(2) at all, and neither discussed the circumstances surrounding the admission of Cusack's testimony or the connection between those circumstances and the IAC prejudice determination. *See* Petition for Writ of Certiorari, *Woodford v. Visciotti*, 537 U.S. 19 (2002) (No. 02-137), 2002 WL 32134887; Brief in Opposition, *id.*, 2002 U.S. S. Ct. Briefs LEXIS 1091. The question whether the California Supreme Court's implicit assumptions as to the inevitable

---

unadjudicated Cusack stabbing." The district court did rely on *Visciotti IV* when it concluded that the presence of other aggravating factors was not "such scant justification for the imposition of a death sentence as to indicate either an unreasonable application of the law or an unreasonable determination of the facts."

admission of Cusack's testimony was factually correct was thus never litigated in the Supreme Court.

Nevertheless, *Visciotti IV* entirely precludes any review at this juncture of Visciotti's IAC claims. *Williams v. Johnson*, 720 F.3d 1212 (9th Cir. 2013), *judgment vacated,* 134 S. Ct. 2659 (2014), requires this conclusion.

*Williams* had previously concluded that the state court had not adjudicated petitioner's claims on the merits. After conducting de novo review, this court granted habeas relief. *Williams v. Cavazos*, 646 F.3d 626, 653 (9th Cir. 2011), *rev'd sub nom. Johnson v. Williams*, 133 S. Ct. 1088 (2013). The Supreme Court granted certiorari. Before the Supreme Court, the parties did not brief — and the Supreme Court did not expressly analyze — the merits of the petitioner's claim under more restrictive standards of § 2254(d). *Williams v. Johnson*, 720 F.3d at 1213 (Reinhardt, J., concurring). Rather, the Supreme Court explained that we had erred in determining that the state court had not adjudicated the case on the merits, and therefore in holding that § 2254 did not apply. *See Johnson v. Williams*, 133 S. Ct. at 1091–92. The Supreme Court's *Williams* opinion nonetheless stated, broadly, "that under [§ 2254(d)] respondent is not entitled to habeas relief." *Id.* at 1092. That sentence, the *Williams* panel concluded on remand, precluded further consideration by this Court of the claim under § 2254(d), even though the Supreme Court's reasoning in its opinion did not support the breadth of its conclusion. 720 F.3d at 1213–14 (Reinhardt, J., concurring). As Judge Kozinski put it, "[d]eference to the judicial hierarchy leaves room for no other course of action on our part." 720 F.3d. at 1214 (Kozinski, J., concurring).

The same is true here.  As in *Williams*, the parties here "did not brief the merits of [Visciotti's § 2254(d)(2) claim regarding ineffective assistance of counsel with respect to Cusack's testimony] before the Court," either by mentioning that section or by discussing the difficulties with the California Supreme Court's assumption concerning the inevitable admission of Cusack's testimony.  *Cf.* 720 F.3d at 1213 (Reinhardt, J., concurring).  Nonetheless, just as in *Williams*, the Supreme Court concluded generically that "[h]abeas relief is . . . not permissible under § 2254(d)." *Visciotti IV*, 537 U.S. at 27.  Accordingly, we could not grant such relief under § 2254(d)(2), a subsection of § 2254(d).  As in *Williams*, "[w]e are . . . required to assume that the Court meant what it said in . . . its opinion, in which it appears to have . . . deliberately precluded us from considering the merits of [Visciotti's] habeas petition under AEDPA." 720 F.3d at 1213–14 (Reinhardt, J., concurring).

Following our second decision in *Williams*, the Supreme Court, without explanation, granted the petitioner's new petition for certiorari, vacated our judgment, and "remanded for consideration of petitioner's Sixth Amendment claim under the standard set forth in 28 U.S.C. § 2254(d)."  134 S. Ct. 2659 (2014).  This development does not change the fact that we are bound by the express language in *Visciotti IV* barring relief on Visciotti's penalty phase IAC claim.  But, as in *Williams*, we "take comfort in knowing that, if we are wrong, we can be summarily reversed."  720 F.3d at 1214 (Kozinski, J., concurring).

"[W]e are an intermediate court within the federal system, and as such, we must take our cue from the Supreme Court." *United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011). As the express language of *Visciotti IV* bars any

reconsideration of Visciotti's penalty phase IAC claims, even one not presented to the Supreme Court in the submissions before it at the time it ruled, we deny his claim for habeas relief.

## 2.  Claim 58 — cumulative error IAC claim

In addition to his penalty phase IAC claim, Visciotti raises a new IAC claim in this appeal, contending that the cumulative effect of Agajanian's ineffective assistance during *both* the guilt and penalty phases of trial prejudiced him with respect to the ultimate penalty imposed by the jury.  The California Supreme Court denied this claim on the merits, and, alternatively, on procedural grounds.

The procedural history of Visciotti's cumulative error claim deserves further mention. When Visciotti first filed his federal habeas petition, he also filed both a notice of unexhausted claims and a motion to equitably toll the AEDPA statute of limitations.  The district court denied the tolling motion.  Visciotti then filed an exhaustion petition in the California Supreme Court in October 1998, about four months after filing the federal petition in district court.  That petition included the cumulative error claim, as Claim 19. Visciotti's filing of the additional petition appeared compelled at that time by *Rose v. Lundy*, 455 U.S. 509, 522 (1982), which was generally understood to require dismissal of petitions containing unexhausted claims.  The California Supreme Court denied the claim on both the merits and procedural grounds.

Visciotti then requested leave to amend his federal petition to include a cumulative error claim, now styled as Claim 58; the district court summarily denied leave.  When

the case was remanded to the district court following *Visciotti IV*, Visciotti renewed his motion for leave to amend his petition. The district court this time granted the motion and ordered an evidentiary hearing. After this Court issued a writ of mandamus, at the state's request, vacating the order for an evidentiary hearing, the district court reconsidered its decision to allow amendment of Visciotti's petition and, this time, struck the amended petition as an improperly filed second or successive petition. The district court thus never decided the cumulative error claim. After oral argument, we expanded the certificate of appealability to include Visciotti's cumulative error claim.[8]

We now turn to the substance of Visciotti's cumulative error claim. The State does not dispute that Agajanian rendered deficient performance throughout the trial. Rather, it contends that, in *Visciotti IV*, the Supreme Court decided whether the cumulative effect of these errors prejudiced Visciotti at the penalty phase. We are constrained to agree. Even assuming that Visciotti could overcome the substantial procedural obstacles he faces, *Visciotti IV* squarely forecloses Visciotti's cumulative error claim as well.

As we have already explained, the Court's conclusion in *Visciotti IV* — that "[h]abeas relief is . . . not permissible under § 2254(d)" — precludes our review of Visciotti's IAC cumulative error claim. *Visciotti IV*, 537 U.S. at 27. Visciotti

---

[8] In light of this procedural history, the State argues that Claim 58 is not properly before us because (1) it was presented in a "second" or "successive" petition, 28 U.S.C. § 2244(b)(3)(A); and (2) the California Supreme Court denied the claim on the alternative basis that it was procedurally defaulted. As we conclude that the Supreme Court's ruling precludes our review of Visciotti's claim in any case, we decline to address these procedural questions.

presents that issue as one specifically raised before, and decided by, the state courts, and therefore as one covered by § 2254(d). That Visciotti did not present this particular, cumulative error, IAC claim to the United States Supreme Court in 2002 does not, for the reasons discussed above, allow us to overlook *Visciotti IV*'s clear, mandatory language. The Court's broad language in *Visciotti IV* therefore covers the issue, and we may not reach it.**[9]**

\* \* \*

In conclusion, the Supreme Court's previous adjudication precludes relief on Visciotti's present penalty phase and cumulative error IAC claims. We therefore do not reach the question whether the California Supreme Court's analysis violated § 2254(d)(2), or whether there was cumulative prejudice at the penalty phase due to ineffective assistance of counsel at both the guilt and penalty phases of trial. Instead, as required by the Supreme Court's ruling in *Visciotti IV*, we affirm the district court's denial of Visciotti's IAC claims.

---

**[9]** Visciotti accurately argues that "a cumulative error claim is a separate, stand-alone claim . . . [not] merely a method of conducting prejudice review for separately alleged claims," and emphasizes that his cumulative error claim includes non-IAC errors such as "claims of prosecutorial misconduct and trial court error." But, in granting Visciotti's request for a certificate of appealability, we limited our review to a single sub-question: whether "the cumulative effect of constitutionally ineffective representation throughout the criminal process, including both the guilt and penalty phases, prejudice[d] Visciotti in the penalty phase of his trial[.]" Thus, while claims of cumulative error may generally be distinct from the underlying errors on which they rely, the particular cumulative error on which we granted a certificate of appealability is not.

## B.  Public Trial Right

The Sixth Amendment guarantees criminal defendants "the right to a speedy and public trial."  U.S. Const. amend VI.  Visciotti contends that the trial judge's closure of the courtroom for six-and-a-half days during the death qualification portion of voir dire violated this Sixth Amendment right.

### 1.  *Legal Principles*

The public trial right, the Supreme Court has repeatedly held, encompasses pre-trial proceedings, including voir dire.

*Press-Enterprise*, 464 U.S. at 511–13, held a trial judge's closure of almost six weeks of death qualification voir dire unconstitutional.  "[S]ince the development of trial by jury," the Court explained, "the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown."  *Id.* at 505.  "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed . . . Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to the public confidence in the system."  *Id.* at 508. Consequently, *Press-Enterprise* cautioned, "[c]losed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness."  *Id.* at 509.  That is, "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Id.* at 510.

*Press-Enterprise* was decided on First Amendment grounds, not Sixth Amendment grounds. *See id.* at 516 (Stevens, J., concurring). Soon thereafter, however, *Waller v. Georgia*, 467 U.S. 39, 47–48 (1984), concluded that a trial judge's closure of a pre-trial suppression hearing violated the defendant's Sixth Amendment public trial right. In so concluding, it relied on *Press-Enterprise* and prior First Amendment precedent, noting that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." *Id.* at 46. *Waller* went on to hold that "under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the tests set out in *Press-Enterprise* and its predecessors" — that is, "the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 47–48. "The requirement of a public trial," *Waller* further explained, "is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ." *Id.* at 46 (internal citations and quotation marks omitted).

More recently, *Presley v. Georgia*, 558 U.S. 209, 212–213 (2010), emphasized that the Sixth Amendment "right to a public trial in criminal cases extends to . . . the *voir dire* of prospective jurors . . . is well settled under *Press-Enterprise* [] and *Waller*." In a per curiam disposition, the Court concluded that "there is no legitimate reason, at least in the context of juror selection proceedings, to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has." *Id.* at 213.

Denial of the public trial right is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Violation of the public trial right is therefore structural error. *See Waller*, 467 U.S. at 49–50; *see also Johnson v. United States*, 520 U.S. 461, 468–69 (1997) (listing the right to a public trial as one of the "very limited class of cases" in which the Court has found structural error). As in other classes of structural error, "a requirement that prejudice be shown would in most cases deprive [the defendant] of the [public-trial] guarantee, for it would be difficult to envisage a case in which he would have evidence available of specific injury." *Waller*, 467 U.S. at 49 n.9 (alterations in original) (internal quotations omitted).

## 2. *Procedural Default*

The State contends that the California Supreme Court denied Visciotti's public trial claim in part on procedural grounds — namely, on the ground that Agajanian failed to object to the trial judge's closure decision. Consequently, before turning to Visciotti's public trial claim we address whether the claim was procedurally defaulted. If in fact the state "discuss[ed] the merits of the claim" but "separately relied on [a] procedural bar, the claim is defaulted." *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015). If the claim is defaulted, we are barred from reviewing the merits of the public trial right claim unless Visciotti can sufficiently establish "cause" and "prejudice" to excuse the default. *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977).

In denying Visciotti's public trial claim, *Visciotti I* stated that "[Visciotti] concedes that the issue was not raised in the trial court." 2 Cal. 4th at 50. It is evident that the California

Supreme Court determined that, as Agajanian did not object to the trial judge's closure of voir dire, Visciotti defaulted his public trial right claim by failing to comply with California contemporaneous-objection rule. That the Court's denial was premised on a procedural ground is all the more clear from its repeated citations to *People v. Thompson*, which held that a defendant's public trial right "may be waived by the failure to assert it in timely fashion." 50 Cal. 3d 134, 157 (1990).

Visciotti acknowledges that Agajanian did not object to the trial judge's closure of death qualification voir dire. But, he contends, Agajanian's ineffective assistance in failing to raise the objection constitutes cause for purposes of excusing the default.[10]  *See Coleman v. Thompson*, 501 U.S. 722,

---

[10] The State argues in its brief that the California Supreme Court "has already found that Visciotti had no cause for his failure to object." That cannot be so.

In the direct appeal opinion, the California Supreme Court stated that the possible benefits of sequestered voir dire to defendants, in combination with the active litigation at the time of Visciotti's trial on the question of the right of the public to attend jury voir dire, made it "doubtful that any competent defense counsel would have objected to it." *Visciotti I*, 2 Cal. 4th at 51. But, on direct review, Visciotti did not seek to excuse his default by claiming Agajanian's ineffectiveness as cause. Nor did the California Supreme Court perform a *Strickland* analysis — properly so, as in California, IAC claims, "except in . . . rare instances," are to be "raised on habeas corpus, not on direct appeal." *People v. Lopez*, 42 Cal. 4th 960, 972 (2008). In any event, the question whether a petitioner's procedural default is excused by cause and prejudice for purposes of federal habeas review is a federal, not state, question. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *see also Martinez v. Ryan*, 132 S. Ct. 1309, 1318 (2012) ("The rules for when a prisoner may establish cause to excuse a procedural default are elaborated in the exercise of the [U.S. Supreme] Court's discretion."); *Murray v. Carrier*, 477 U.S. 478, 517 (1986) (Brennan, J., dissenting) (noting that the cause-and-prejudice rule

753–54 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).[11] To demonstrate such ineffectiveness, Visciotti must satisfy *Strickland*'s familiar standard: he must establish that Agajanian's performance was deficient and that he was prejudiced by the deficient performance. 466 U.S. at 687–88.

Before proceeding to the *Strickland* analysis, we consider a preliminary question: should we "give AEDPA deference to the state court determination on an ineffective assistance of counsel claim when deciding whether that claim constitutes cause for procedural default[?]" *Jones v. Ryan*, 691 F.3d 1093, 1101 n.2 (9th Cir. 2012).[12] There is disagreement among federal courts of appeal on this question. *See Janosky v. St. Amand*, 594 F.3d 39, 44–45 (1st Cir. 2010).[13]

---

constitutes an exercise of "*federal power* to entertain a habeas petition in the face of a procedural default" (emphasis added)).

[11] Visciotti alleged in his initial state habeas petition that trial counsel was ineffective for failing to object to closing the courtroom. The California Supreme Court rejected the claim without analysis. *See Visciotti II*, 14 Cal. 4th at 329, 333. The IAC claim was therefore properly "presented" to the state courts for exhaustion purposes. *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000).

[12] *Jones* expressly declined to answer this question, as it held the petitioner's IAC claim there failed whether it was reviewed de novo or applying AEDPA deference. *See id.*

[13] *Compare Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) ("Although [petitioner] must satisfy the AEDPA standard with respect to his independent IAC claim, he need not do so to claim ineffective assistance for the purpose of establishing cause"), *and Fischetti v. Johnson*, 384 F.3d 140, 154–55 (3d Cir. 2004) (same), *with Richardson v. Lemke*, 745 F.3d 258, 273 (7th Cir. 2014) (when reviewing a state court's resolution of an ineffective assistance claim in the cause-and-prejudice context, it applies the "same deferential standard as [it] would

We agree with our sister circuits that have reviewed IAC claims in the cause-and-prejudice context de novo, thereby applying a "differing standard for evaluating constitutional error as a substantive basis of relief and as a cause to avoid default of other claims." *Fischetti*, 384 F.3d at 154. As the cases so proceeding have recognized, the *Coleman* cause and prejudice standard was in no way affected by AEDPA. "AEDPA does not establish a statutory high hurdle for the issue of cause," and *Coleman* "made its determination of cause, or lack of cause, based on a straightforward analysis whether the denial of counsel was 'an independent constitutional violation.'" *Id.* at 154–55 (quoting *Coleman*, 501 U.S. at 755). Absent any indication to the contrary in AEDPA, the *Coleman* independent constitutional analysis continues to apply, post-AEDPA, to a contention that trial counsel IAC constitutes cause to excuse a procedural default.

Accordingly, the question whether we can review the merits of Visciotti's public trial right claim turns entirely on whether Visciotti has established that trial counsel was ineffective, under the *Strickland* standard, for not objecting to the trial judge's closure of death qualification voir dire. To that question we now turn.

### 3. *Deficient Performance*

To prevail on a *Strickland* ineffective assistance of counsel claim, "the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. Counsel is deficient when he or she "made errors so serious

---

when reviewing the claim on its own merits," declining to follow the approach taken by other courts that review so-called "nested ineffective assistance issues" de novo).

that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; that is, when "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. Our review of counsel's performance is deferential, for "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Carrera v. Ayers*, 670 F.3d 938, 943 (9th Cir. 2011) (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted). Recognizing that the Sixth Amendment's guarantees "do[] not insure that defense counsel will recognize and raise every conceivable constitutional claim," *Engle v. Isaac*, 456 U.S. 107, 134 (1982), we cannot conclude that Agajanian's failure to object to the closure of death qualification voir dire constituted deficient performance under *Strickland*.

We reiterate that, since Visciotti's 1983 trial, the Supreme Court has unequivocally established that the Sixth Amendment guarantees a defendant's right to public voir dire. *Presley*, 558 U.S. at 212–13; *see also United States v. Cazares*, 788 F.3d 956, 970 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 2484 (2016). We have also suggested previously that counsel's failure to object to the closure of voir dire may, at least in some circumstances, "[fall] below an objective standard of reasonableness . . . particularly because the right to a public trial is critical to ensuring a fair trial," *United States v. Withers*, 638 F.3d 1055, 1066 (9th Cir. 2010). At least two of our sister circuits have found that a failure to object to partial closure of trial proceedings, including voir dire, can constitute ineffective assistance of counsel. *See Johnson v. Sherry*, 586 F.3d 439, 446 (6th Cir. 2009); *Owens v. United States*, 483 F.3d 48, 64 (1st Cir. 2007).

Those decisions, however, do not foreclose the possibility that in specific instances, counsel's choice not to object to closure of trial proceedings might be sound trial strategy. For example, the First Circuit has held in two cases decided after *Owens* that counsel may make a reasonable strategic choice not to oppose partial closure of voir dire, *Wilder v. United States*, 806 F.3d 653, 660 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 2031 (2016), or to forgo an objection to devote limited resources to more important trial issues, *Bucci v. United States*, 662 F.3d 18, 32 (1st Cir. 2011). The Supreme Court has long held that a defendant may waive his right to a public trial. *Levine v. United States*, 362 U.S. 610, 619–20 (1960). As Justice Brennan observed in *Levine*, the power to waive the right "must be . . . based on a defendant's conclusion that 'in his particular situation his interests will be better served by foregoing the privilege than by exercising it.'" *Id*. at 626 (Brennan, J., dissenting) (quoting *United States v. Sorrentino*, 175 F.2d 721, 723 (3d Cir. 1949)).

As the Supreme Court explained in *Strickland*, our "highly deferential" review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. At the time of Visciotti's trial in 1983, neither *Press-Enterprise* nor *Waller* had yet been decided; in fact, "the question of press access to voir dire was a matter of active litigation." *Thompson*, 50 Cal. 3d at 157; *see also United States v. Brooklier*, 685 F.2d 1162, 1167 (9th Cir. 1982) ("The standard for determining whether a criminal proceeding may be closed to the public and the proper allocation of the burden of making the required showing are not yet clearly settled."). While a prudent attorney in Agajanian's position may have

objected to closure to preserve the issue while it was being resolved in the appellate courts, we cannot say that *any* competent attorney would have done so, given that some measure of sequestration of jurors during voir dire was at the time required by California law in capital cases.

Three years earlier, in *Hovey v. Superior Court*, 28 Cal. 3d 1, 80 (1980), *superseded by statute*, 1990 Cal. Legis. Serv. Prop. 115 (West) (1990) (codified at Cal. Civ. Proc. Code § 223), the California Supreme Court had required California state courts to conduct "individualized sequestered voir dire" when evaluating potential jurors' qualifications to hear a capital case. As the State explains, the *Hovey* requirement was based on evidence that showed that sequestration of the jury panel during voir dire about penalty "minimize[d] the tendency of a death-qualified jury to presume guilt and expect conviction," *id.*, and therefore resulted in more favorable juries for capital defendants.

As Visciotti points out, *Hovey* required only the insulation of prospective jurors from the death qualification questioning of their *peers*, emphasizing that the rule it prescribed would "not in any way affect the open nature of a trial." *Id.* at 80–81. *Hovey* thus did not in express terms require closure of voir dire proceedings to the public. But California courts appear often to have understood *Hovey* to support the principle that a general closure of voir dire proceedings would be similarly beneficial to the defendant. For example, in *Thompson*, "[t]o comply with *Hovey*'s mandate," the trial court "conducted the death-qualification voir dire in chambers" where "[n]either the public nor the press was present." 50 Cal. 3d at 156. The California Supreme Court held that there was no violation of the public trial right in part because "the sequestered voir dire was

ordered by the judge primarily for the benefit of the defendant." *Id.* at 157. In *Visciotti I*, the California Supreme Court similarly cited *Hovey* in the course of explaining that "because the sequestered voir dire is for the benefit of the defendant 'it is doubtful that any competent defense counsel would have objected to it.'" 2 Cal. 4th at 51 (quoting *Thompson*, 50 Cal. 3d at 156–57). Against this background, competent counsel in 1983 may similarly have reasonably believed that closure of voir dire was in the best interests of his client.

We recognize the importance of a defendant's interest in preserving his right to a public trial. "Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982). And we recognize that the cases since Visciotti's trial suggest that counsel's failure to safeguard this right during voir dire may in some contexts fall below objective standards of reasonable representation. Nevertheless, in "tak[ing] account of the variety of circumstances faced by defense counsel," we must not "restrict the wide latitude counsel must have in making tactical decisions," and must accord considerable deference to trial counsel's representation decisions when reviewing counsel's performance on a cold record. *Strickland*, 466 U.S. at 688–89. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. . . . That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'"

*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (quoting *Massaro v. United States*, 538 U.S. 500, 505 (2003)). Failing to object to the closure of voir dire in Visciotti's trial cannot overcome our "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).[14]

In sum, we cannot conclude that counsel's failure to object to the closure of the death qualification voir dire constituted deficient performance.[15] Visciotti therefore

---

[14] The parties dispute the extent to which closure of voir dire was the norm during this period. The State's counsel represented at oral argument that "in California from 1980 to 1990 it was the prevailing norm of defense counsel to seek closure of the voir dire as to the death penalty phase, the *Hovey* voir dire. That was the prevailing norm of counsel." The panel then inquired whether the State's reference to the prevailing norm meant that "the practice was just to exclude prospective jurors or to exclude everybody?" "Based on personal knowledge," the State's counsel continued, "it was as a practice, it was always done in chambers." Visciotti contested this representation, and submitted certified transcripts of several California capital trials conducted around the time of Visciotti's trial to demonstrate that it was not "prevailing" practice to close the courtroom to the public and press. These transcripts reveal that, at least in these California capital cases, the trial courts implementing *Hovey* sequestered voir dire conducted such proceedings in open court, not in chambers. But, again, *Thompson* and *Brooklier* point in the opposite direction. From this mixed record we cannot conclude that counsel's failure to object ran counter to "prevailing professional norms." *Strickland*, 466 U.S. at 688.

[15] The Supreme Court has recently held that a petitioner claiming that trial counsel was ineffective for failing to object to the closure of voir dire bears the burden of demonstrating prejudice. *Weaver v. Massachusetts*, No. 16-240, slip op. at 11–14 (U.S. June 22, 2017). Because of our holding that counsel's performance was not ineffective, we need not

cannot demonstrate cause to excuse his default of the public trial right claim.

## IV.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of habeas relief with respect to each of Visciotti's claims.

**AFFIRMED.**

BERZON, Circuit Judge, joined by PREGERSON, Circuit Judge, concurring:

Not surprisingly, I join the principal opinion in full.  I write separately to emphasize one point: This case illustrates that Supreme Court summary reversals cannot, and do not, reflect the same complete understanding of a case as decisions after plenary review.  Relying on broad language in such decisions, as we do in Section III.A, *supra*, is an obligation of intermediate courts of appeals.  But fulfilling that obligation does not require that we blinker reality by pretending that the summary reversal entailed full consideration of the issues covered by the language of the Supreme Court opinion issued.

At the certiorari stage, the parties' submissions are — quite properly — not designed comprehensively to inform the Court about the merits of a case.  The Supreme Court's Rules

determine whether Visciotti could demonstrate prejudice.  We note, however, that it is extremely dubious that he could.

explain that petitions for certiorari "will be granted only for compelling reasons," including when (1) the decision below conflicts with the decisions of federal courts of appeals or state courts of last resort on an "important matter" or "an important federal question"; (2) the decision conflicts with a Supreme Court decision on an "important question of federal law"; and (3) when the lower court "decide[s] an important question of federal law that has not been, but should be, settled by th[e] Court."  S. Ct. R. 10.

Both scholarly articles and Supreme Court practice guides suggest that petitioners will encounter greater success at the petition for certiorari stage when they emphasize "certworthy" aspects of the decision below, such as the presence of a circuit conflict or the national importance of an issue, rather than their legal and factual arguments on the merits.  *See* Stephen M. Shapiro et al., Supreme Court Practice, ch. 4.17, at 278 (10th ed. 2013).  Whether the decision below conflicts with decisions of other courts appears to be the paramount factor at the certiorari stage. Scholars have estimated that "seventy percent of Court's plenary docket is devoted to addressing legal issues on which lower courts have differed, and law clerks and Justices alike have acknowledged that ensuring uniformity is a driving force in case selection."  Amanda Frost, *Overvaluing Uniformity*, 94 Va. L. Rev. 1567, 1569 (2008); David R. Stras, *The Supreme Court's Gatekeepers: The Role of Law Clerks in the Certiorari Process*, 85 Tex. L. Rev. 947, 982 (2007) (collecting data from 2003 to 2005 terms).[1]  "Most of

---

[1] *See also* Supreme Court Practice, ch. 4.3, at 241 (providing data about the 1993 term); Kevin H. Smith, *Certiorari and the Supreme Court Agenda: An Empirical Analysis*, 54 Okla. L. Rev. 727, 747 (2001) ("[S]tatistical analysis suggests that the Supreme Court is more likely to

the rest are cases that involve no conflict among lower courts but present contentious legal issues of great national significance." Robert M. Yablon, *Justice Sotomayor and the Supreme Court's Certiorari Process*, 123 Yale L.J. Forum 551, 561 (2014).

Practice guides and other secondary sources recommend that petitioners specifically *avoid* describing the merits of a case in too great detail, so as to dissuade the Court from perceiving the certiorari petition merely as a request for "error correction." Quoting Justice Vinson, the authoritative guide to Supreme Court practice explains: "Lawyers might be well-advised, in preparing [certiorari petitions] to spend a little less time discussing the merits of their cases and a little more time demonstrating why it is important that the Court should hear them." Supreme Court Practice, ch. 6.31(a), at 479.[2]          Similarly, as successful briefs in opposition to

grant certiorari if the petition for a writ of certiorari contains an allegation of a conflict with Supreme Court precedent or contains an allegation of a conflict between two or more federal circuit courts of appeals than if such a claim of conflict is absent.") (footnotes omitted); Robert M. Lawless & Dylan Lager Murray, *An Empirical Analysis of Bankruptcy Certiorari*, 62 Mo. L. Rev. 101, 133 (1997) (concluding that "the existence and depth of a circuit conflict is important when the Court decides whether to grant [certiorari] in a bankruptcy case"); Kevin Russell, *Commentary: Writing a Convincing Cert. Petition When There is No Direct Circuit Split*, SCOTUSblog (May 17, 2007), available at http://www.scotusblog.com/ 2007/05/commentary-writing-a-convincing-cert-petition-when-there-is-no-direct-circuit-split/.

[2] *Accord* Timothy S. Bishop, Jeffrey W. Sarles & Stephen J. Kane, *Tips on Petitioning for and Opposing Certiorari in the U.S. Supreme Court*, Litigation, Winter 2008 ("It is crucial to temper the natural instinct to focus on defending or attacking the lower court's decision on the merits."); Scott L. Nelson, *Getting Your Foot in the Door: The Petition for Certiorari*, Public Citizen Litigation Group, *available at*

certiorari are in many respects "the mirror image of an effective [certiorari] petition," demonstrating that "the decision below was right . . . is definitely a secondary argument" at best. Stewart A. Baker, *A Practical Guide to Certiorari*, 33 Cath. U. L. Rev. 611, 627, 629 (1984); *see also* Supreme Court Practice, ch. 512(c), at 355 ("The merits of the decision below are not among the ceritorari considerations of Rule 10 . . . [n]either the petition nor the brief in opposition is designed to be a brief on the merits."). As Justice Stevens explained:

> The most helpful and persuasive petitions for certiorari to this Court usually present only one or two issues, and spend a considerable amount of time explaining why those questions of law have sweeping importance and have divided or confused other courts. Given the page limitations that we impose, a litigant cannot write such a petition if he decides, or is required, to raise every claim that might possibly warrant reversal in his particular case.

*O'Sullivan v. Boerckel*, 526 U.S. 838, 858 (1999) (Stevens, J., dissenting).

It comes as no surprise, then, that parties do not — indeed, *should not* — fully develop their merits arguments in certiorari-stage briefing. *See* Supreme Court Practice, ch.

---

https://www.citizen.org/documents/GettingYourFootintheDoor.pdf ("[Y]ou don't want your merits argument to suggest that your principal goal is error correction as opposed to the presentation of an important issue requiring the Court's review.").

6.31(c), at 484 ("The attempt to show error below . . . should not be a long, full-dress argument such as would be proper in the brief on the merits."). Normally, of course, this omission raises no concerns; if the Court grants certiorari, the parties will be afforded substantial opportunity to explain their positions in their merits-stage briefing and at oral argument. But when the Court issues a summary reversal, without the benefit of merits-stage briefing or oral argument, it necessarily decides the case based on the limited presentation and arguments raised in the certiorari-stage briefing.

Such was the case here. As the principal opinion explains, in their certiorari-stage briefing in *Visciotti IV*, neither the State nor Visciotti raised the particular IAC claims now at issue in this appeal, nor did either explain that further issues could be litigated on remand. Instead, the State's petition for certiorari contested, and Visciotti's brief in opposition defended, our previous conclusion that the California Supreme Court's *Strickland* prejudice determination was contrary to or an unreasonable application of established federal law for particular reasons, in violation of 28 U.S.C. § 2254(d)(1). Thus, the Supreme Court never had before it the questions whether (1) the California Supreme Court's assumption that Cusack's testimony would have been before the jury regardless of any ineffective assistance of counsel constitutes an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2); and (2) the cumulative effect of Agajanian's IAC during both the guilt and penalty phases of trial prejudiced Visciotti at the penalty phase.

That Visciotti did not raise these claims was not an oversight or poor lawyering. His "opposition to the [State's] petition for certiorari understandably focuse[d] on arguments

for denying certiorari." *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 271 (1982) (Blackmun, J., dissenting).

Nevertheless, at the end of its summary reversal, the Court held broadly that "[h]abeas relief is . . . not permissible under § 2254(d)." *Visciotti IV*, 537 U.S. at 27. Today, we conclude that this language precludes our review of Visciotti's present IAC claims. In so concluding, our opinion simply reflects, as in *Williams v. Johnson*, 720 F.3d 1212 (9th Cir. 2013), *judgment vacated,* 134 S. Ct. 2659 (2014), what the Court actually encompassed in its broad language. And, as appears to have been the case in *Williams*, that breadth may have been inadvertent.

My concern is that "[t]he Court's decisionmaking process at the certiorari stage is fundamentally different from traditional judicial decisionmaking." Margaret Meriwether Cordray & Richard Cordray, *Strategy in Supreme Court Case Selection: The Relationship Between Certiorari and the Merits*, 69 Ohio St. L.J. 1, 3 (2008). Summary reversals, which are the product of such a decisionmaking process, are also fundamentally different from traditional judicial opinions, as they issue without the benefit of fully developed, adversarial legal argument. As a result, what these decisions say about the broader merits of a case may not reflect the interwoven legal issues and arguments omitted from the parties' certiorari-stage briefing. And so, Justice Blackmun observed, by deciding unraised claims and questions "without briefing or argument, . . . the Court's summary disposition [can] deprive[] respondents of their 'day in court.'" *Hollywood Motor*, 458 U.S. at 271–72 (Blackmun, J., dissenting).

As the principal opinion recognizes, the Court's summary per curiam reversals are no less binding upon us than the authored opinions issued after full briefing and argument. *Visciotti IV* therefore requires that we deny habeas relief on Visciotti's present IAC claims, even though the substance of such claims were never presented to the Court and were almost surely not actually considered.

In *Williams*, the Supreme Court corrected the apparently inadvertent overreach of its original opinion by reversing our second opinion without comment. *Williams v. Johnson*, 134 S. Ct. 2659 (2014). Notably, *Williams* was neither a capital case nor one in which the Supreme Court's first decision was a summary reversal. Here, a person's life *is* at stake, and the Court proceeded without following its plenary processes. If a second certiorari petition is filed, as I expect it will be, I fully anticipate that, as in *Williams*, the Court will look closely at whether it meant to reject the quite colorable issues raised before us on remand, never alluded to in our prior opinion or in the papers filed in the Supreme Court, with regard to whether certiorari should be granted.